**REVCO D.S., INC. and Carter Glogau Laboratories, Inc., Plaintiffs,**

**v.**

**GOVERNMENT EMPLOYEES INSURANCE COMPANY, First State Insurance Company and New England Insurance Company, Defendants.**

**No. 5:89 CV 0457.**

United States District Court,
N.D. Ohio, E.D.

Aug. 28, 1991.

**1256**

Jerry A. Gibson, Plunkett, Gibson & Allen, San Antonio, Tex., Donald A. Wochna, Baker & Hostetler, John E. Martindale, Benesch, Freidlander, Coplan & Aronoff, Cleveland, Ohio, for plaintiffs.

Timothy G. Sweeney, Walter A. Rodgers, Larry C. Greathouse, Quandt, Giffels, Buck & Rodgers, Cleveland, Ohio, Mark J. Cannan, Lang, Cross, Ladon, San Antonio, Tex., for Government Employees Ins.

Franklin H. Perry, S. David Smith, David Michael Taylor, Beth D. Bradley, Thompson, Coe, Cousins & Irons, Dallas, Tex., Harold H. Reader, Ulmer & Berne, Cleveland, Ohio, for First State Ins.

Gregory Mark Gordon, James P. Karen, Michael Rice, Gary A. Garfield, Patricia Jane Villareal, Jones, Day, Reavis & Pogue, Dallas, Tex., Hugh R. Whiting, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for New England Ins. Co.

## MEMORANDUM OPINION

DOWD, District Judge.

### INTRODUCTION

This case is before the Court on cross-motions for summary judgment by plaintiffs and defendants GEICO and First State.[1] In an Order dated August 13, 1990, (Docket No. 238), the Court deferred scheduling summary judgment practice with regard to plaintiffs' claims against defendant New England Insurance Company ("New England") pending resolution of the Revco, GEICO and First State motions for summary judgment. The parties have stipulated to an uncontested set of facts for purposes of the submission of the motions for summary judgment. See, Docket Nos. 240 and 250.

The Court begins its Opinion with a summary of the facts, the claims and the ultimate conclusions. The above-captioned suit involves a dispute over insurance coverage. Plaintiffs, Revco D.S., Inc. ("Revco") and its wholly owned subsidiary Carter Glogau Laboratories, Inc. ("Carter Glogau"), seek a judgment from this Court declaring that plaintiffs are entitled to "drop down" insurance coverage from defendants GEICO and First State and also declaring that GEICO and First State had a duty to defend plaintiffs in litigation brought against them by O'Neal, Jones & Feldman ("OJF") and OJF's insurers.

For the period of June 1, 1983 to June 1, 1984, Revco had in place a complex insurance scheme involving layers of excess liability insurance over and above coverage provided by a primary insurer. During that period, Revco's subsidiary Carter Glogau manufactured a product known as E–Ferol, a vitamin E solution which was administered intravenously to premature in-

---

1. Specifically, the Court has before it plaintiffs' motion for partial summary judgment on the drop down issue against defendants First State Insurance Company ("First State") and Government Employees Insurance Company ("GEICO"), (Docket No. 242), and plaintiffs' motion for partial summary judgment against defendant GEICO, (Docket No. 244). Also before the Court is defendant First State's response to plaintiffs' motion for summary judgment, (Docket No. 254), defendant GEICO's response to plaintiffs' motion for summary judgment, (Docket No. 255), plaintiffs' reply to GEICO's response to plaintiffs' motion for summary judgment, (Docket No. 256), and plaintiffs' reply to defendant First State's response to plaintiffs'

motion for summary judgment, (Docket No. 257).

The Court also has before it defendant First State's motion for summary judgment, or in the alternative partial summary judgment, (Docket No. 246), plaintiffs' response to defendant First State's motion for summary judgment, or in the alternative partial summary judgment, (Docket No. 253), and defendant First State's reply to plaintiffs' response to its motion for summary judgment, (Docket No. 259).

Finally, the Court has pending before it defendant GEICO's motion for summary judgment, (Docket No. 251), and plaintiffs' response to defendant GEICO's motion for summary judgment, (Docket No. 252).

fants. The E–Ferol drug allegedly caused injury and death to over one-hundred premature infants and numerous lawsuits were brought against plaintiffs.

Revco's primary liability insurance carrier paid the outer limits of its coverage; Revco's first layer of excess liability insurance which was provided by Transit Insurance Company ("Transit") was then reached. After paying only a portion of its available coverage, Transit became insolvent and thus unable to pay E–Ferol claims. Revco qualified for relief from the Ohio Insurance Guaranty Association ("OIGA") which paid about $9,133,510.46 in claims resulting from the insolvency of Transit. Revco paid numerous claims as well.

Defendant GEICO's layer of excess insurance was eventually reached by virtue of the payments of Transit, OIGA and Revco. GEICO shared the second layer of excess insurance coverage in the amount of Twenty–Five Million Dollars. GEICO was to provide Ten Million Dollars of coverage in the second layer, and Midland was to provide Fifteen Million Dollars. Midland became insolvent before its layer was reached. Once the GEICO/Midland layer of insurance coverage was reached, GEICO paid forty per cent of the covered claims.

In addition to being sued for injuries and deaths resulting from the use of the E–Ferol drug, Revco and Carter Glogau were also sued by an entity known as O'Neal, Jones & Feldman ("OJF") and OJF's insurers. OJF purchased some of the E–Ferol solution and distributed it along with Carter Glogau. Thus, OJF was sued following the injuries and deaths resulting from use of the drug. Revco issued certificates of insurance to OJF evidencing the type and amount of insurance Revco had available to settle claims. After being sued in the E–Ferol controversy, OJF and its carriers brought suit against plaintiffs and others asserting various causes of action relating to the certificates of insurance provided to OJF by Revco. Two of OJF's insurance carriers asserted a RICO claim against Revco as well.

Revco paid a total of $1,500,000.00 in settlement of the OJF suit and dismissal of the RICO suit. GEICO, while not believing that it had any obligation to or on behalf of Revco to settle the OJF suit, advanced Revco One Million Dollars toward the OJF settlement.

Plaintiffs assert several claims which must be addressed in resolving the cross motions for summary judgment. First, plaintiffs argue that GEICO and/or First State had a duty to drop down and assume insurance coverage at the point of Transit's insolvency. Next plaintiffs contend that GEICO, irrespective of whether it had a duty to drop down, had a duty, once its layer of insurance coverage was reached, to pay one-hundred per cent of the claims in its layer of insurance coverage rather than the forty per cent which it has been paying.

Finally, plaintiffs assert that GEICO and/or First State had a duty to defend Revco in the OJF litigation.

The Court must also address GEICO's claim that it is entitled to recoup the One Million Dollars it advanced to Revco for settlement of the OJF litigation.

For the reasons set forth and elaborated on below, the Court finds that neither GEICO nor First State had a duty to drop down and assume insurance coverage at the point of Transit's insolvency. Accordingly, the Court grants defendants GEICO and First State summary judgment on plaintiffs' claim for drop down insurance coverage. Next the Court finds that GEICO was only obligated to pay forty per cent of covered claims once its layer of insurance was reached and therefore grants defendant GEICO summary judgment on plaintiffs' claim for payment of one-hundred per cent of the covered claims in the GEICO/Midland layer of insurance coverage.

The Court next concludes that neither GEICO nor First State had a duty to defend plaintiffs in the OJF litigation. Accordingly, the Court grants defendants GEICO and First State summary judgment on plaintiffs' claims relating to the duty to defend plaintiffs in the OJF litigation.

Finally, the Court finds that GEICO is entitled to recoup its One Million Dollars paid to Revco toward the settlement of the OJF litigation.

## A. FACTS.[2]

### 1. *Revco's Insurance Scheme.*

For the period June 1, 1983 through June 1, 1984, Revco maintained One–Hundred and Fifty Million Dollars in excess insurance coverage over and above a primary policy insured through United Insurance Company ("United"). Revco's insurance program for the period June 1, 1983 through June 1, 1984 consisted of a set of layers of insurance coverage. The first layer of insurance coverage was provided by United under a comprehensive general liability policy with limits of One Million Dollars per occurrence and Four Million Dollars in the aggregate.[3] The first layer of coverage in excess of the United policy was provided by Transit Insurance Company ("Transit") under an umbrella policy. The Transit policy provided liability coverage in excess of United's limits, and the agreed premium for Transit's policy was Two–Hundred and Twenty–Five Thousand Dollars.

The second excess layer of insurance coverage was carried jointly by GEICO and Midland Insurance Company ("Midland"), and provided for Twenty–Five Million Dollars in excess of Twenty–Five Million Dollars and the limits of the United policy. This second layer of umbrella insurance was shared by Midland and GEICO, with Midland carrying sixty per cent and GEICO carrying forty per cent of the layer, and, as indicated in the joint stipulations, with the understanding that once this layer was reached, Midland would pay sixty per cent of all covered claims and expenses and GEICO would pay forty per cent of all covered claims and expenses. Stipulations, Docket No. 240. The agreed premium for GEICO's portion of this layer of insurance was Ten Thousand Dollars and for Midland's portion was Fifteen Thousand Dollars.

The next layer of excess insurance coverage was provided by defendant First State. First State's policy provided Twenty–Five Million Dollars in excess of Fifty Million Dollars and the United limits. Revco agreed to pay a premium of Eighteen Thousand and Seven–Hundred and Fifty Dollars for First State's layer of coverage.

The layer above First State's was shared by Federal Insurance Company ("Federal") and Twin City Insurance Limited ("Twin City") and provided for Twenty–Five Million Dollars in excess of Seventy–Five Million Dollars, Federal insuring sixty per cent and Twin City insuring forty per cent of the layer. The premium for Federal's portion was Seven Thousand and Five Hundred Dollars.

The final layer of umbrella insurance, Fifty Million Dollars in excess of One–Hundred Million Dollars and the United limits, was apportioned among six insurers.[4]

The United primary policy was brokered by American Risk Management ("ARM") which is located in Cleveland, Ohio. The excess liability policies were brokered by Fred S. James who was located in New York City, New York. Larry Bell, an employee of and vice president of Revco from 1979 through 1987, negotiated the policies with GEICO and First State on behalf of Revco, with the assistance of Fred S. James. Larry Bell was responsible for placement of Revco's insurance program for May 1, 1983 through May 1, 1984. Mr. Bell required that a "follow form" endorse-

---

**2.** The parties have submitted joint stipulations of fact for the purpose of summary judgment. *See,* Docket Nos. 240 and 250. The facts are summarized from these joint stipulations.

**3.** United is an off-shore insurance carrier which is headquartered in the Cayman Islands. At the time it issued Revco's policy, United was not a licensed carrier in the United States.

**4.** The six insurers and their respective percentages of insurance coverage and premiums are as follows: 1.) Twin City (20%) and $9,000 premium for both layers of coverage provided by Twin City; 2.) Hartford (20%) and $4,000 premium; 3.) International (20%) and $4,000 premium; 4.) Mission (20%) and $4,000 premium; Great Southwest (10%) and $2,000 premium, and Continental Insurance (10%) and $2,000 premium.

ment, the language of which he negotiated, be attached to the First State and GEICO policies of insurance. Mr. Bell was located in Ohio during the negotiations.

Revco issued certificates of insurance to vendors of its pharmaceutical products as evidence of the amount and type of insurance coverage Revco had available to satisfy claims. Because United was an offshore insurer and was not an admitted insurance carrier in many states, Revco entered into a fronting arrangement with Northwestern National ("Northwestern") whereby Revco was able to issue certificates from an admitted company. The certificates of insurance provided by Revco listed Northwestern as the comprehensive general liability carrier; however, no comprehensive general liability policy was in fact issued by Northwestern to Revco.[5] Northwestern entered into a separate hold harmless agreement with Revco, requiring indemnity for losses arising out of the certificate program, which was executed by Larry Bell as an officer of the corporation and dated June 5, 1980.

## 2. The E–Ferol Controversy.

The present dispute over insurance coverage stems from the manufacture and distribution of the drug E–Ferol. The drug E–Ferol was manufactured by Carter Glogau and distributed by O'Neal, Jones and Feldman ("OJF"). The alleged negligence of Carter Glogau and OJF caused death and injury to over one-hundred premature infants who were administered the E–Ferol drug intravenously. Both Carter Glogau and OJF were sued throughout the nation.

United paid Two Million Dollars in E–Ferol claims, and exhausted its coverage for two occurrences based upon two shipments of the E–Ferol solution. Transit was declared insolvent on December 3, 1985. Prior to being declared insolvent, Transit paid approximately $3,400,000 in settlement of E–Ferol claims. Midland was ordered into liquidation in April of 1986, and was declared insolvent before paying any claims under its policy.

After Transit's insolvency, Revco qualified for relief from the Ohio Insurance Guaranty Association ("OIGA"). To qualify for such relief, Revco had to affirm that there was no other insurance presently available. To date, the OIGA has paid $9,133,510.46 for claims resulting from the insolvency of Transit. Revco has not yet received funds from OIGA resulting from the insolvency of Midland, but has submitted claims for relief which are still under consideration.

The GEICO/Midland layer of insurance was reached; by the time the layer was reached, Midland was already insolvent. GEICO has paid $7,054,453.07 in E–Ferol claims and expenses to date, which represents payment of GEICO's forty per cent share of covered claims and expenses. Revco made no objection to GEICO's only paying forty per cent of the covered claims and expenses in its insurance layer until this case was filed.

If Transit and Midland had not been declared insolvent, the insurance provided by First State would not yet have been reached. The parties have stipulated that GEICO's decision not to drop down and assume liability at the point of Transit's insolvency was made in good faith and was consistent with any duty of good faith and fair dealing that GEICO may have owed to Revco.

## 3. The OJF Litigation.

Revco and Carter Glogau were sued by OJF and its insurers as a result of the E–Ferol crisis. OJF and its insurers argued that they were entitled to the insurance Revco and Carter Glogau had available on the basis of the certificates of insurance which had been provided to OJF by Revco. Two separate lawsuits were filed against Revco and Carter Glogau. The first suit was brought in state court in San Antonio, Texas and set forth allegations of misrepresentation as to insurance coverage, negligence, and breach of an indemnity agreement. OJF sought damages in the

---

**5.** The only insurance policy issued by Northwestern to Revco was a worker's compensation policy which did not include general liability coverage.

amounts that it had to pay in settlement of the underlying E–Ferol claims and lawsuits. Eventually, OJF's insurers, Highlands Insurance Company ("Highlands"), Hartford Insurance Company ("Hartford"), and New England Insurance Company ("New England"), intervened in the state court suit.

A second suit was brought by Hartford and Highland in the United States District Court in San Antonio, Texas against Revco alleging a RICO cause of action. Revco eventually paid a total amount of $1,500,-000 in settlement of the OJF controversy, and as part of the settlement, the RICO action was dismissed.

The parties have stipulated that GEICO never agreed to defend Revco or Carter Glogau in the OJF case. Likewise, Revco never demanded or requested in writing that GEICO defend Revco or Carter Glogau in either the OJF or the RICO suit. Revco did submit bills to GEICO, but GEICO refused to pay them. Revco never demanded or requested in writing that First State defend Revco or Carter Glogau in the OJF suit or the RICO action. The parties have further stipulated that the conduct of GEICO in handling the E–Ferol and OJF suits was in good faith and was consistent with any duty of good faith and fair dealing. In addition, it has been stipulated that while GEICO did not believe that it had any obligation to pay any sum to settle the OJF case, it nonetheless advanced on behalf of Revco the sum of One Million Dollars.[6]

The parties have further stipulated that the first demand that Revco made upon First State to defend or indemnify Revco in the OJF or RICO suit was the filing of the above-captioned suit by Revco against, *inter alia*, First State.

## DISCUSSION

### A. CHOICE OF LAW.

■ As a preliminary matter, this Court must decide which state's law governs this

matter. Defendants First State and GEICO each argue that Ohio law governs the present controversy. Revco, on the other hand, asserts that the law of Texas should be applied by this Court to resolve the present dispute. For the reasons elaborated on below, the Court finds that Ohio law should be applied to resolve the present case.

A federal court sitting in diversity must apply the substantive law of the state within which it sits. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Supreme Court stated in *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that state substantive law includes a state's choice of law principles and held, accordingly, that a federal court sitting in diversity must apply the conflict of law principles of the state within which the federal court sits. *Id.* at 496, 61 S.Ct. at 1021.

This Court must, therefore, apply Ohio's choice of law principles to determine which state's laws will govern the present controversy. In the syllabus to *Gries Sports Enterprises, Inc. v. Modell*, 15 Ohio St.3d 284, 15 OBR 417, 473 N.E.2d 807 (1984), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985), the Ohio Supreme Court adopted Section 188 of 1 Restatement of the Law, 2d, Conflict of Laws. *Id.* at 284, 15 OBR 417, 473 N.E.2d 807. Section 188 addresses the issue of which state's law to apply to an issue in contract and provides that:

> [i]n the absence of an effective choice of law by the parties ..., the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,

---

**6.** GEICO asserts that the agreement it entered into with Revco with respect to the settlement of the OJF suit provides for the recoupment by GEICO of its One Million Dollar payment. GEICO further asserts that the issue of whether it is in fact entitled to recoup its One Million Dollars was, pursuant to the agreement, to be resolved by the present declaratory judgment action.

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflicts § 188 (1971).[7]

These factors were applied in *Borden, Inc. v. Affiliated FM Ins. Co.*, 682 F.Supp. 927 (N.D.Ohio 1987), *cert. denied*, 493 U.S. 817, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989), a case in which the plaintiff sought a declaratory judgment that defendant had a duty under an insurance contract to defend and indemnify. *Id.* at 928. In that case, the Court found that Ohio had the most significant relationship to the insurance contracts at issue since the insurance contracts were negotiated and entered into in Ohio, the contracts were to be performed in all states where the plaintiff conducted its operations, including Ohio, and plaintiff had its principal place of business in Ohio. *Id.* at 928–29.

Revco argues that application of the most significant relationship test should lead this Court to apply Texas law to the present controversy since both First State and GEICO have "places of business" in Texas,[8] First State is a wholly-owned subsidiary of Hartford Insurance Company which has an office in San Antonio, Texas,

and Texas was the place of performance of the insurance contracts. Revco asserts that the place of performance of the contracts was Texas because the majority of the claims stemming from use of the E–Ferol drug were filed in Texas, and consequently the place that First State and GEICO would have had a duty to drop down, investigate, defend and settle would have been Texas.

In addition, Revco argues that First State, in a service of suit clause contained in the First State policy, has agreed to appear in any court of competent jurisdiction, and to submit any controversy arising out of the insurance contract to the laws of that court.[9] Accordingly, Revco argues that since Texas is a court of competent jurisdiction, First State should submit to its laws being applied in the present case.

Finally, Revco argues that the portion of its claim that is "tortious" in nature should also be tried under Texas law since Texas has the most significant relationship to that aspect of the case as well. Revco asserts that the parties whose claims form the subject of the drop down issue were by and large from Texas; Revco paid more than Twenty Million Dollars in settlement of those claims in Texas; Texas has an interest in determining the rights of the insureds to policies covering litigation in Texas courts, and, Texas has a strong interest in protecting insureds who initially choose to litigate in Texas courts.

---

7. Section 6 of 1 Restatement of the Law, 2d, Conflict of Laws provides that the factors relevant to a choice of the applicable rule of law include:

 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied.
 Restatement (Second) of Conflicts § 6 (1971).

8. First State is a Delaware Corporation with its headquarters in Massachusetts, and GEICO is a

Maryland corporation with its headquarters in Washington, D.C.

9. The service of suit clause provides that:

 [i]t is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Insured, will submit to the jurisdiction of any Court of Competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.
 Exhibits and Deposition Excerpts to Defendant First State Insurance Company's Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment, Docket No. 248 at Exhibit 6 [hereinafter First State's Exhibit].

First State and GEICO assert, on the other hand, that Ohio law should be applied to this controversy. First State asserts that Ohio law should be applied since Revco is incorporated in Ohio, the insurance policy was negotiated by Larry Bell who was in Ohio during the negotiations, and the premiums and premium taxes were paid from Ohio.

An examination of the relevant contacts in the present case leads the Court to the conclusion that Ohio law governs the dispute. The Court first addresses Revco's argument that First State, through the service of suit clause in its insurance policy, has consented to the application of Texas law to the present case. The Court finds the reasoning in *Chesapeake Utilities Corp. v. American Home Assurance Co.*, 704 F.Supp. 551 (D.Del.1989), persuasive on this issue. In *Chesapeake, supra,* the Court found that a service of suit clause contained in two insurance contracts was not the equivalent of a choice of law provision. *Id.* at 557. In that case, the insurers agreed to " 'submit to the jurisdiction of any Court of the United States' and further agreed that all disputes arising under the policies 'shall be determined in accordance with the law and practice of such Court.' " *Id.*

The District Court in *Chesapeake* found that:

[t]he Court has no doubt that the parties could have agreed in advance upon the law which would govern any subsequent contract dispute. However in this case the parties reached no such agreement. The above-quoted language is part of a service of suit clause. It is not a choice of law provision.

*Id.*

The language in the First State policy is essentially the same as the language in the insurance policies at issue in *Chesapeake.* The Court finds that the service of suit clause is merely a venue provision by which First State has agreed to appear in any court which has competent jurisdiction and to abide by the laws and practices of such court. The law and practice of a federal court sitting in diversity is to apply the law of the state in which the federal court sits, including the state's choice of law principles. *Id.* Accordingly, the Court finds that the existence of the service of suit clause in the First State policy is not dispositive of the choice of law issue.[10]

The Court finds that Ohio has the most significant relationship to this controversy and its law should apply. The facts which lead the Court to this conclusion follow. Negotiations leading up to the contracts of excess liability insurance were conducted by Larry Bell on behalf of Revco, and Fred S. James as broker for the excess liability policies. Larry Bell was located in Ohio during those negotiations, and Fred S. James was located in New York City, New York. The premiums on the excess liability

---

10. The Court notes that Revco may have a successful argument that Texas', and not Ohio's, choice of law principles should be applied to determine whose law applies to the present controversy. In *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), the Supreme Court found that when a case is transferred pursuant to 28 U.S.C. § 1404(a) at the request of a defendant, "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue. A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms." *Id.* at 639, 84 S.Ct. at 820.

The present case was not transferred pursuant to 28 U.S.C. § 1404(a), but rather, was transferred pursuant to 28 U.S.C. § 1412 which provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412 (1988). The Court has not uncovered any cases which have applied the *Van Dusen* principle to transfers pursuant to 28 U.S.C. § 1412. However, the Court finds that even if the *Van Dusen* principle is applicable to transfers pursuant to Section 1412, its application would not change the result in the present case since Texas, like Ohio, applies the most significant relationship test to issues in contract and application of that test to the facts in the present case, as is elaborated on below in the body of this Opinion, results in adoption of Ohio law. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984) (court holding that "in all choice of law cases, except those contract cases in which the parties have agreed to a valid choice of law clause, the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue").

policies were paid from Ohio, as were the premium taxes.

Plaintiff Revco's principal place of business and headquarters is in Ohio. After Transit was declared insolvent, Revco qualified for relief from the Ohio Insurance Guaranty Association ("OIGA"), and the OIGA has paid $9,133,510.46 for claims resulting from Transit's insolvency. In addition, Revco has submitted to the OIGA but has not yet been paid for claims resulting from the insolvency of Midland.

The Court finds that in the present case the place of incorporation and place of business of plaintiff Revco is a highly significant factor pointing toward application of Ohio law to the dispute. Ohio has a strong interest in a dispute regarding insurance coverage of one of its insureds.

In addition, the Court finds that the Texas connections cited by plaintiff Revco are really not that significant in terms of the present suit. The present suit involves the interpretation of two insurance contracts and a determination of the duties of two insurance companies under those insurance policies. The fact that this suit resulted ultimately from the E–Ferol controversy and the fact that many of the E–Ferol claims were brought in Texas does not render Texas the state with the most significant relationship to the suit. To determine which state's law applies to a controversy, the essence of the suit must be examined and the contacts considered in light of the subject of the suit. This suit is not one for personal injury resulting from the use of the E–Ferol drug. Rather, this suit concerns the scope of excess liability insurance coverage for an Ohio corporation. Ohio, not Texas, has a concern that its domiciliaries' rights under insurance contracts are protected.[11] Accordingly, the Court holds that it will apply Ohio law to the present controversy.

**B. SUMMARY JUDGMENT STANDARD.**

It is well established that when considering a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *United States v. Hodges X–Ray, Inc.*, 759 F.2d 557 (6th Cir.1985); *Tee–Pak, Inc. v. St. Regis Paper Co.*, 491 F.2d 1193 (6th Cir.1974); *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir.1962). However, the nonmoving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e). The "adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his] response, by affidavits or otherwise ..., must set forth specific facts showing there is a genuine issue for trial. If [he] does not so respond, summary judgment, if appropriate, shall be entered against [him]." Fed.R.Civ.P. 56(e).

A court may grant summary judgment only if there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398

11. The Court also notes that it does not agree with Revco's argument that the place of performance of the insurance contracts was Texas. The subject insurance contracts were to cover Revco in whatever locations Revco did business. Thus, the place of performance of these contracts was not simply Texas, but was any state where Revco might be subject to liability. Due to the fact that no one state was the place of performance of the contracts, the Court finds that the state of incorporation has a stronger relationship to the controversy than does a state such as Texas where the insurance companies might have been called upon to pay monies and defend pursuant to the policies.

U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). Therefore, "[i]f the evidence is merely colorable, . . . , or is not significantly probative, summary judgment may be granted." *Id.* at 249–250, 106 S.Ct. at 2511–12 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. at 290, 88 S.Ct. at 1593). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512)). Moreover, summary judgment is appropriate when the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

## C. THE DROP DOWN ISSUE.

The Court will now address the issue of whether defendant First State and/or defendant GEICO have a duty to "drop down" and provide insurance coverage at the point of Transit's insolvency. Revco asserts numerous arguments in support of its contention that GEICO and First State each have a duty to drop down and assume insurance coverage where Transit left off. The Court will begin by addressing, generally, the issue of the duty of an excess liability insurance carrier to drop down and assume coverage where insolvent underlying insurers have left off. Next, the Court will examine the specific policy language of first the First State and then the GEICO insurance policy to determine whether either one has a duty to drop down to attach coverage at the point of Transit's insolvency.

### 1. *The Duty to Drop Down in General.*

The Court begins by addressing excess insurance coverage in general. In a recent annotation, (Annotation, *Primary Insurer's Insolvency as Affecting Insurer's Liability*, 85 ALR 4th 927 (1991)), it is pointed out that:

> [p]roviding against liability or losses now constitutes an essential business expense, and, to a lesser extent, an advisable expenditure in the nonbusiness world . . . It is not unusual to find three levels of coverage for a business: a primary insurer, whose premiums are commensurate with the high degree of risk that that insurance covers, an excess insurer whose policy will "kick in" when the primary level is spent out, and an umbrella policy which covers the level which the insured hopes will be the point beyond which no insurance is needed. The premiums of the excess insurer are considerably lower than those of the primary insurer, in view of the reduced risk that there will be liability or loss in the amount covered by such excess insurance, and the premiums of the umbrella excess insurer are smaller yet, again based on an even more greatly reduced risk.

*Id.* at 735. Although, as is pointed out in the above passage, the purpose behind excess insurance coverage is generally to provide coverage beyond that provided by a primary policy, an increasing number of courts have had to face the issue which this Court currently faces of whether an excess carrier has a duty to drop down and assume coverage when an underlying carrier becomes insolvent.

Whether or not an excess insurer has a duty to drop down is a matter of contract interpretation and construction. *Value City, Inc. v. Integrity Ins. Co.*, 30 Ohio App.3d 274, 276, 30 OBR 472, 508 N.E.2d

184 (1986) (court in case involving drop down liability stating that "[t]he ultimate issue presented upon appeal, which is one of first impression in Ohio, is whether the language of the excess insurance contract encompasses the risk of insolvency of the primary carrier"). Likewise, "[t]he interpretation and construction of insurance documents is a matter to be determined by the court using rules of construction and interpretation applicable to contracts generally." *Id.* (citations omitted). The parties to the present cross-motions for summary judgment have stipulated to the authenticity of First State Policy no. 934363; Transit policy no. UMB 950304; GEICO policy no. GXU 30260, and to the fact of both Transit's and Midland's insolvency. Accordingly, the Court must interpret and construe the subject insurance documents and decide, since there are no material facts in dispute regarding the drop down issue, whether either of the insurers or both are obligated to drop down and assume coverage.

■ The two leading cases in Ohio on the drop down issue are: *Value City Inc. v. Integrity Ins. Co.,* 30 Ohio App.3d 274, 30 OBR 472, 508 N.E.2d 184 (1986) and *Wurth v. Ideal Mut. Ins. Co.,* 34 Ohio App.3d 325, 518 N.E.2d 607 (1987). The Court of Appeals for Warren County, in *Wurth, supra,* provided a detailed discussion of the drop down issue and how such an issue is handled in the Ohio courts. The Court in that case indicated that cases from various jurisdictions addressing the issue have generally found drop down liability in one of several ways. First, some courts have found that, as a matter of public policy, excess insurers should be held liable to drop down in the event of insolvency of an underlying carrier. *Wurth,* 34 Ohio App. at 328, 518 N.E.2d 607. In *Wurth,* this public policy notion was rejected. *Id.* The Court explained that:

[t]o adopt, due to public policy, a theory of 'drop down' liability would fundamentally alter the risk an excess coverage provider is obligated to provide by agreeing to issue excess liability insurance protection. Therefore, we hold 'drop down' liability protection should not be judicially imposed on Ohio excess insurance providers as a matter of public policy.

*Id.*

The *Wurth* Court also noted that parties to an insurance agreement can enter into an express agreement whereby the excess liability insurer agrees to drop down and assume coverage in the event of the insolvency of an underlying carrier. The Court stated that "we recognize that the inclusion of specific policy language manifesting an agreement by the excess insurer to 'drop down' and become the primary insurer, due to the insolvency of the primary insurer, may be expressly written into an excess liability policy." *Id.* In such an instance, the court would enforce the clear intention of the parties to the insurance agreement.[12]

Finally, the *Wurth* Court noted that there may be instances in which insurance policies are ambiguous with respect to the drop down issue. The Court explained first, that if language in a policy is unambiguous, "the plain meaning . . . [of such language] in an insurance policy should be enforced as written." *Id.* at 329, 518 N.E.2d 607 (citing *Rhoades v. Equitable Life Assur. Soc. of United States,* 54 Ohio St.2d 45, 47, 8 O.O.3d 39, 374 N.E.2d 643 (1978)). If policy language is ambiguous, however, it should be construed against the insurer because the insurer "must accept responsibility for the wording chosen." *Id.* (citations omitted). The Court continued by stating that if two or more provisions of a contract conflict, "the construction or interpretation which should be used is one which gives effect to both provisions, unless no such construction is reasonably pos-

---

**12.** The Court in *Wurth, supra,* noted as well that "[w]here such language is found in an excess insurance policy, the risk of loss due to the primary carrier's insolvency is shifted because *presumably* the excess carrier has computed and added the necessary premium adjustment." *Wurth,* 34 Ohio App. at 328, 518 N.E.2d 607. That is, one of the traditional features of excess insurance policies is low premiums commensurate to the lower risk that the insurance company will have to pay out on claims.

sible." *Id.* (citations omitted). The *Wurth* court additionally indicated that a court should construe a contract based upon the entire content of the contract and not simply upon isolated portions. *Id.* (citations omitted).

Revco does not contend that the insurance policies at issue contain express provision for drop down coverage. Likewise, Revco recognizes that Ohio does not have a general public policy which favors imposition of drop down liability. Instead, Revco argues that the policy language in both the GEICO and the First State insurance policies is ambiguous and that, as such, the language must be interpreted in favor of Revco, the insured, and the Court should reasonably find that GEICO and First State are liable to drop down. The Court will now examine the specific policy language in first the First State and then the GEICO insurance policies to determine whether a duty to drop down exists.

### 2. *First State Insurance Policy*

 Revco makes the following argument with respect to the language in the First State policy. First, Revco argues that the First State policy "follows form" to the Transit insurance policy. Endorsement # 2 to the First State policy provides that "[i]n consideration of the premium charged, it is agreed that this policy shall follow the terms, definitions, exclusions of Transit Policy # To Be Advised. The foregoing shall not apply to the premium, policy period, renewal or extension agreement (if any), or the limit of liability. . . ." First State's Exhibit 6. Revco contends that the follow form endorsement requires that the terms of the Transit policy be read into the First State policy. Revco further contends

that the language contained in the Transit policy, which should be read into the First State policy pursuant to the follow form endorsement, is ambiguous and consequently Revco, the insured, is entitled to have the policy interpreted in its favor with the result that First State is required to drop down.

The Declarations page of the Transit umbrella liability policy provides that the Limits of Liability shall be "*$25,000,000* Single limit any one OCCURRENCE combined PERSONAL INJURY, PROPERTY DAMAGE and ADVERTISING INJURY or DAMAGE in excess of: A. The amount recoverable under the underlying insurance as set out in Schedule A . . ." First State's Exhibit 8. Revco argues that courts have found that the language "amount recoverable" allows for drop down liability and that, since this language is read into the First State policy through the follow form endorsement, this Court should find that First State has a duty to drop down.[13]

The Court rejects Revco's argument that the "amount recoverable" language from the Transit policy is read into the First State policy via the follow form endorsement. Endorsement # 2 to the First State policy clearly states that the First State policy does not follow form to Transit's limit of liability provision. The Court, therefore, must examine the language of the First State policy to determine whether First State is obligated to drop down.

The First State policy sets forth limits of liability and underlying limits as follows:

It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have

---

**13.** Revco cites to several cases in which the language "amounts recoverable" has been found to provide for drop down coverage. Specifically, Revco cites to a recent Fifth Circuit case, *Sifers v. General Marine Catering Co.*, 892 F.2d 386 (5th Cir.1990). In *Sifers,* the Court stated that

 [w]e have interpreted the term "recoverable" to mean the amount *actually recoverable* from the underlying policies. In *Mission Nat'l Ins. Co. v. Duke Transp. Co.* [792 F.2d 550 (5th Cir.1986) ], we found that under Louisiana law, "[w]hen an excess insurer uses the term

'collectible' or 'recoverable' it is agreeing to 'drop down' in the event that the primary coverage becomes uncollectible or unrecoverable"; we concluded that the language in the policy at issue, "other valid and collectible insurance," provided drop-down coverage when the primary insurer became insolvent. Hence, our caselaw dictates that "recoverable" does not even fall within the category of ambiguous terms; its meaning is fixed in favor of the insured.

*Id.* at 401 (footnotes omitted).

paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:

(a) $ 50,000,000. ultimate net loss in respect of each occurrence, but

(b) $ 50,000,000. in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and separately in respect of Personal Injury (fatal or nonfatal) by Occupational Disease sustained by any employees of the Assured

and the Company shall then be liabile [sic] to pay only the excess thereof up to a further

(c) $ 25,000,000. ultimate net loss in all in respect of each occurrence—subject to a limit of

(d) $ 25,000,000. in the aggregate for each annual period during the currency of this policy, separately in respect of Product Liability and separately in respect of Personal Injury (fatal or nonfatal) by Occupational Disease sustained by any employees of the Assured.

Courts examining language such as that found in the First State policy have found that such language does not require that an insurer drop down since the phrase "only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss ..." refers to a sum certain. *See, e.g., Hudson Ins. Co. v. Gelman Sciences Inc.*, 706 F.Supp. 25, 26–27 (N.D.Ill.1989), *aff'd*, 921 F.2d 92 (1990) (court finding that language to the effect that excess insurer is not liable "until the underlying insurers have paid or are held liable to pay" is unambiguous and does not require drop down); *Highlands Ins. Co. v. Gerber Products Co.*, 702 F.Supp. 109, 112 (D.Md.1988), (court finding no drop down liability where excess insurance policy provided that liability did not attach until " 'Underlying Umbrella Insurers have paid

or have been held liable to pay the full amount of their respective ultimate net loss' ").[14]

The Court finds that the language in the First State policy is not, as Revco asserts in its motion for summary judgment, ambiguous. Rather, the Court finds that the language in the First State policy is unambiguous and as such must be given its plain meaning by the Court. First, the First State policy clearly is a policy for excess umbrella liability insurance. Thus, it seems clear to the Court that First State and Revco entered an agreement whereby First State would provide coverage in excess of certain limits. As the court explained in *Wurth, supra*, excess liability coverage is coverage for "amounts 'over,' *i.e.*, above, beyond, greater than, or exceeding, any other available and applicable insurance...." *Wurth*, 34 Ohio App. at 330, 518 N.E.2d 607.

The Court next notes that the language of the follow form endorsement clearly indicates that while First State would follow form to the terms and conditions of the Transit policy, it would not follow form to several provisions such as the limits of liability. The limits of liability portion of the First State policy indicates in plain words that First State's liability will attach *"only after* the Underlying Umbrella Insurers *have paid or have been held liable to pay* the full amount of their respective ultimate net loss liability" in the amount of $50,000,000 (emphasis added).

The Court finds Revco's argument that the "limit of liability" provision is really a "term" which, pursuant to the follow form endorsement, must be read from the Transit policy into the First State policy and which accordingly creates an ambiguity, strained and unpersuasive. Revco attempts to create ambiguity where none exists and attempts to persuade the Court to interpret and construe an insurance contract in an unreasonable manner. The fol-

14. Indeed, Revco concedes the point that if the Court looks purely to the language found in the First State and GEICO policies, and follows the majority rule, it must not find drop down liability. Of course, Revco argues that it believes that

the Court should not follow the majority in construing the language in the First State and GEICO policies, but rather, should find drop down liability.

low form endorsement clearly exempts from its ambit First State's limits of liability. From the language in the limit of liability section of First State's policy it is clear that First State was to become liable only after a sum certain in underlying insurance had been paid.

The parties could have, if they had so chosen, bargained for drop down coverage. However, in the absence of such an express provision, and, in light of the fact that the policy language is unambiguous and indicates that no duty to drop down exists, the Court must give the words of the contract their plain meaning. *Gomolka v. Ins. Co.,* 70 Ohio St.2d 166, 168, 24 O.O.3d 274, 436 N.E.2d 1347 (1982).[15] Accordingly, the Court finds that First State is not liable to drop down and is entitled to summary judgment on the issue of drop down liability.

### 3. *GEICO Insurance Policy.*

■ The Court turns now to the language in the GEICO insurance policy. The GEICO policy contains two follow form provisions, one in the printed GEICO policy, and one typewritten and attached to the policy as Endorsement number 3. The follow form provision in the body of the policy is as follows:

> This policy is subject to the same terms, definitions, exclusions, and conditions (except as otherwise provided herein) as are contained in the immediate underlying umbrella policy; but this policy shall not be subject to the terms and conditions of the immediate underlying umbrella policy with respect to the premium, the policy period, the renewal or extension agreement (if any), the amount and limits of liability, or any other term, definition, exclusion, or condition which may be inconsistent with this policy.

In Endorsement Number 3, a typewritten addition to the GEICO policy, it is stated that "[i]t is agreed that this policy shall follow the terms, definitions, exclusions of Transit Casualty Policy No. TBA. The foregoing shall not apply to premium, poli-cy period, renewal or extension agreement (if any), or the limit of liability."

Revco argues that the typewritten follow form endorsement should prevail over the printed follow form provision in the GEICO policy; Revco further argues that GEICO should be held liable to drop down since the language in the Transit policy, which is incorporated through the follow form endorsement, is ambiguous and should be construed in favor of Revco.

Revco argues that the follow form provision in the GEICO policy is more restrictive than the follow form endorsement to the GEICO policy since it states that the GEICO policy will not be subject to any inconsistent term. Revco further asserts that the specific deletion of the restrictive language should be given effect and GEICO should be found to follow form to Transit's limits of liability.

The Court finds that it need not address the issue of which follow form provision governs since the Court is of the view that the result is the same under either provision. That is, each provision states that GEICO does not follow form to Transit's limits of liability.

In the limit of liability section of the GEICO policy it is stated that:

> [i]t is expressly agreed that liability shall attach to GEICO only after the full amount of the underlying umbrella limits shall have been paid by or on behalf of the insured, and GEICO shall then be held liable to pay only the excess thereof up to a further
>
> (a) $10,000,000 ultimate net loss with respect to each occurrence—subject to a limit of
>
> (b) $10,000,000 in the aggregate for each annual period with respect to any hazard for which an aggregate limit of liability applies in the immediate underlying policy,
>
> which is part of $25,000,000 each occurrence and aggregate where applicable in excess of Items (4) and (5) above.

---

**15.** The Court in *Gomolka, supra,* stated that "where the provisions of an insurance policy are clear and unambiguous courts may not indulge themselves in enlarging the contract by implication in order to embrace an object distinct from that contemplated by the parties ... nor read into the contract a meaning not placed there by an act of the parties." *Gomolka,* 70 Ohio St.2d at 168, 24 O.O.3d 274, 436 N.E.2d 1347.

Again the Court finds that Revco is straining to find drop down liability where none exists through creative arguments and attempts at establishing ambiguity in places where the contract language is clear. For the same reasons as were presented in the section on First State's drop down liability, the Court finds that GEICO has no duty to drop down to assume coverage at the point of Transit's insolvency. Indeed, GEICO's limit of liability provision is even clearer than First State's since it provides that liability shall attach only after the full amounts of the underlying umbrella limits shall have been paid.

For the reasons set forth above, the Court finds that defendant GEICO, under the unambiguous terms of its insurance contract, does not have a duty to drop down and assume insurance coverage at the point of Transit's insolvency. Accordingly, the Court grants GEICO summary judgment on Revco's claim for drop down coverage.[16]

### D. GEICO'S DUTY TO "DROP OVER".

■ Revco also makes the argument that, irrespective of whether GEICO has a duty to drop down to assume coverage at the point of Transit's insolvency, Revco is entitled to judgment as a matter of law that GEICO has a duty to assume one-hundred per cent of the settlements and defense of the E–Ferol claims as opposed to the forty per cent it has been paying. That is, Revco contends that once GEICO's layer of coverage was reached, GEICO had a duty to pay up to Ten Million Dollars aggregate limits for claims incurred in excess of the Transit policy.

GEICO asserts, on the other hand, that once its layer of excess liability insurance was reached, the terms of its policy clearly indicate that GEICO is only obligated to pay forty per cent of the covered claims and expenses. GEICO contends that from an examination of the GEICO policy it is clear that GEICO's layer of insurance was shared with Midland and that if and when the layer was reached, GEICO would only be responsible for forty per cent of the covered claims and Midland the other sixty per cent.

Revco responds that there is nothing in the GEICO policy which indicates that GEICO is only liable for forty per cent of the covered claims. Rather, the policy states that GEICO must pay covered claims up to Ten Million Dollars. Revco asserts that if GEICO had intended only to pay a pro rata share once its layer was reached, then it should have clearly indicated such in its policy. Instead, the policy makes no mention of a pro rata share, nor does it mention Midland. Rather, the only language pointing to the fact that GEICO's is a shared layer is the language on the declarations page which states that GEICO's Ten Million Dollars per occurrence is part of Twenty–Five Million Dollars each occurrence.

GEICO responds that in the Declaration section of its policy it is clear that the GEICO layer of insurance is a layer shared by GEICO and Midland and that GEICO's limit of liability is Ten Million Dollars per occurrence and aggregate which is part of Twenty–Five Million Dollars per occurrence and aggregate. GEICO contends that the insertion of the language "part of" renders it obvious from the face of the policy that GEICO and Midland would share covered claims, with GEICO assuming responsibility for forty per cent of the claims and Midland sixty per cent.

The parties have cited to no specific authority on the issue of whether an excess insurer sharing an excess layer of insurance coverage has an obligation to "drop over" and assume full responsibility for claims in the layer in the event one of the insurers becomes insolvent. The Court will, however, apply the same rules which it utilized in resolving the issue of drop down liability and will construe and interpret the GEICO policy to determine wheth-

---

**16.** With the number of cases addressing the issue of whether excess insurers have a duty to drop down, this Court wonders whether and when insurers and insureds will begin specifically and clearly addressing the issue of drop down coverage within the excess insurance contract so that the matter is settled definitively between the parties. If insolvency of an underlying insurer is a relatively frequent occurrence, parties to insurance contracts should address it.

er GEICO has "drop over" liability under the contract.

The Declarations page of the GEICO policy states that GEICO's limit of liability is Ten Million Dollars each occurrence and Ten Million Dollars aggregate "which is part of $25,000,000 each occurrence and aggregate ..." Motion for Summary Judgment of Defendant, Government Employees Insurance Company, Docket No. 251 at Exhibit D [hereinafter GEICO's Motion for Summary Judgment]. The Court finds that while it is not precisely spelled out that once the GEICO/Midland layer is reached, coverage will be shared on a pro rata basis, this is the only logical manner in which the contract can be interpreted. That is, the Court finds that if a layer of insurance is shared, in the absence of specific language pointing otherwise, each insurer pays its respective percentage of covered claims. The insurance contract does not say that GEICO will pay the first Ten Million Dollars in covered claims. Instead, the language clearly indicates that coverage will be apportioned.

The Court finds that the language of the GEICO policy indicates that GEICO and Midland would each pay its respective share of covered claims. Accordingly, the Court does not find Revco's argument that GEICO must pay claims up to Ten Million Dollars well taken. To require GEICO to pay the full Ten Million Dollars would be tantamount to making GEICO the insurer of Midland's solvency, a responsibility GEICO did not assume under the insurance contract in question.

Accordingly, the Court grants GEICO summary judgment on plaintiffs' claim that GEICO must pay one-hundred per cent of the claims in its layer of insurance rather than the forty per cent it has been paying.

E. REVCO'S ARGUMENT THAT GEICO AND FIRST STATE HAVE A DUTY TO PAY THE DEFENSE COSTS INCURRED BY REVCO IN THE UNDERLYING COVERAGE SUIT BROUGHT BY O'NEAL, JONES & FELDMAN AND ITS INSURERS IN BEXAR COUNTY, TEXAS.

Revco argues in its motion for summary judgment against GEICO that, irrespective of any drop down liability on the part of GEICO, GEICO had a duty to defend Revco in the lawsuits brought against it and Carter Glogau by O'Neal, Jones & Feldman. First State notes in its response brief to Revco's motion for summary judgment on the drop down issue that while Revco asserts in its complaint that both GEICO and First State had a duty to defend, Revco only argues that GEICO had a duty to defend in its motion for summary judgment. By way of precaution, however, First State presents arguments as to why it does not have a duty to defend. The Court is unsure whether and why Revco has seemingly abandoned its assertion that First State had a duty to defend. Arguably, Revco has waived its right to assert this contention by not presenting it in its motions for summary judgment. However, in the interests of finally resolving all issues with respect to GEICO and First States' alleged liability to Revco, the Court will decide both whether GEICO and/or whether First State had a duty to defend Revco in the OJF litigation.

Revco makes the following arguments as to why GEICO and First State had a duty to defend it and Carter Glogau in the OJF litigation. Revco first argues that GEICO and First State had a duty to defend since their policies are follow form policies to the Transit policy and Transit had a duty to defend under its policy. Plaintiffs argue that Transit agreed to provide coverage for ultimate net loss resulting because of personal injury and the OJF litigation arose because of personal injury allegedly caused by the use of plaintiffs' product. Revco next argues that Transit accepted coverage over the OJF litigation until its insolvency without a reservation of its rights and by this action bound the excess carriers to continue providing a defense.

GEICO makes the following arguments against imposition of a duty to defend. GEICO first asserts that it had no duty to defend in the OJF litigation since the claims in the OJF litigation did not arise because of personal injury. Second, GEI-

CO argues that it had no duty to defend since the Insurance Company as Named Insured Endorsement [17] to the Transit policy specifically excluded the OJF claims from coverage under the Transit, GEICO and First State policies. Finally, GEICO asserts that it has no duty to defend since the breach of an agreement to provide insurance is not an occurrence under the terms of the Transit policy and therefore no duty to defend existed.

First State asserts the following arguments against imposition of a duty to defend. First State argues first that the complaint in the OJF litigation pertains only to damages from Revco's alleged agreement to provide insurance coverage or to procure insurance and therefore the claims were not covered by its policy and it had no duty to defend. First State next argues that the allegations in the OJF litigation fell squarely within the exclusion of the Insurance Company as Named Insured Endorsement to the Transit policy and therefore it had no duty to defend. Finally, First State contends that Transit's waiver, if any, does not bind the excess insurers.

The determination whether GEICO and/or First State had a duty to defend Revco and Carter Glogau in the OJF litigation requires this Court again to construe and interpret the subject insurance policies. *See, e.g., Value City*, 30 Ohio App.3d at 279, 30 OBR 472, 508 N.E.2d 184 (court looking to the "defense provisions" of the insurance policies to determine whether excess insurer had a duty to provide a de-

fense); *Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276, 278 (5th Cir.1989) (court indicating that the determination of whether excess insurer has a duty to defend is dependent upon the terms of the insurance contract). Accordingly, the Court looks to the terms of the GEICO and First State policies to decide whether either had a duty to defend.

Not only must the Court examine the policies to determine whether a duty to defend existed, the Court must also examine the allegations and factual background of the OJF litigation. The Ohio Supreme Court stated in *Motorists Mutual Ins. Co. v. Trainor*, 33 Ohio St.2d 41, 62 O.O.2d 402, 294 N.E.2d 874 (1973), that "[t]he test of the duty of an insurance company, under a policy of liability insurance, to defend an action against an insured, is the scope of the allegations of the complaint in the action against the insured, and where the complaint brings the action within the coverage of the policy the insurer is required to make defense, regardless of the ultimate outcome of the action or its liability to the insured." *Id.* at 41, 62 O.O.2d 402, 294 N.E.2d 874. In *City of Willoughby Hills v. Cincinnati Ins. Co.*, 9 Ohio St.3d 177, 9 OBR 463, 459 N.E.2d 555 (1984), the Ohio Supreme Court expanded its prior holding in *Motorists Mutual* and held that:

> [w]here the insurer's duty to defend is not apparent from the pleadings in the action against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy cov-

---

**17.** The Insurance Company as Named Insured Endorsement provides as follows:

> In consideration of the premium charged, it is agreed that this policy does not apply to any liability for personal injury or property damage:
> 1. Arising out of any obligation assumed by the Insured as an insurer or reinsurer under any policy or contract of insurance, reinsurance, suretyship, endowment, or annuity;
> 2. Arising out of professional services, errors or omission committed or alleged to have been committed by the Insured or any person or organization for whose acts the Insured is legally liable in:
> A. Effecting insurance contracts, binders or policies;

> B. Advising or reporting in any capacity as an insurance company;
> C. The rendering of, or failure to render safety engineering or inspection services;
> D. The audit of accounts or records of others;
> E. The operation of its investment, loan or real estate departments;
> F. Settling or failure to settle any claim under any policy of insurance, reinsurance, endowment, suretyship or annuity;
> G. Paying or failure to pay any claim under any contract of insurance, reinsurance, endowment, suretyship or annuity, due to bankruptcy, or insufficient funds;
> H. Purchasing or failure to purchase adequate limits of reinsurance.

erage has been pleaded, the insurer must accept the defense of the claim.

*Id.* at 177, 9 OBR 463, 459 N.E.2d 555. The Court in *Willoughby Hills, supra,* noted that with notice pleading rules now in place, "the pleadings alone may not provide sufficient factual information to determine whether the insurer has an obligation to defend the insured." *Id.* at 180, 9 OBR 463, 459 N.E.2d 555.

The Court begins by examining the nature of the OJF litigation and the claims asserted against plaintiffs in this litigation. In their first amended original petition, plaintiffs O'Neal, Jones & Feldman, Highlands Insurance Company, and Hartford Accident and Indemnity Company, alleged that OJF purchased E–Ferol solution from the manufacturing defendants, including plaintiffs in the present case, and that the E–Ferol solution allegedly caused injury and/or death to numerous premature infants who were administered the solution. OJF asserted that claims and lawsuits were brought against it arising from the injuries and death. In its first amended petition, OJF alleged that as a part of the business relationship between itself and the manufacturing defendants, the manufacturing defendants promised to provide OJF with vendor's liability insurance protection and represented that such insurance coverage would protect OJF in the event of any claims resulting from the sale of any of Carter Glogau's products, including the E–Ferol solution.

OJF alleged that when it called upon the defendants to provide the coverage which they promised, the defendants refused to provide any defense, coverage or other protection. OJF asserted the following claims against the defendants: 1.) breach of an insuring contract; 2.) violations of the Texas Insurance Code; 3.) breach of the duty of good faith and fair dealing, and 4.) breach of express and implied warranties that the E–Ferol solution would be safe, pure and fit for administration to infants

and premature infants.[18] First State's Exhibit 10.

In their later petitions, OJF and its insurers added claims of fraud and deceit, civil conspiracy, negligence, claims under the Unfair Claims Settlement Practices Act, claims of waiver and estoppel of the right to claim lack of insurance coverage, and breach of implied covenants and warranties.

Neither the GEICO nor the First State policy specifically mentions the duty to defend. However, as was indicated above, both policies follow form to the Transit policy. The Transit policy states as follows with respect to defense and settlement:

IV. DEFENSE—SETTLEMENT

A. With respect to any OCCURRENCE not covered, as warranted, by the underlying policies listed in Schedule A hereof, whether collectible or not, or not covered by any other underlying insurance collectible by the INSURED, but covered by the terms and conditions of this policy, except for the RETAINED LIMIT stated in Item 3 L B of the Declarations, the Company shall:

(1) defend any suit against the Insured alleging PERSONAL INJURY, PROPERTY DAMAGE or ADVERTISING INJURY or DAMAGE and seeking damages therefore, even if such suit is groundless, false or fraudulent; but the COMPANY may make such investigation, negotiation or settlement of any claim or suit as it deems expedient. The INSURED shall promptly reimburse the COMPANY for any amount paid in the satisfaction of cases defended hereunder within the retained limit after making proper deduction for all recoveries and salvage collectible, but excluding all loss expense and legal expense

(2) with respect to any suit defended under the terms of this coverage, in addition to the applicable limit of liability under this policy the COMPANY shall:

---

**18.** In all later amended petitions, the claim regarding breach of express and implied warran-

ties was omitted.

(a) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish such bonds;

(b) pay all expenses incurred by the COMPANY, all costs taxed against the INSURED in any such suit and all interest accruing after the entry of judgment until the COMPANY has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the COMPANY'S liability thereon;

(c) pay reasonable expenses incurred by the INSURED at the COMPANY'S request in assisting the COMPANY in the investigation or defense of any claim or suit including actual loss of earnings not to exceed $25 per day, but the COMPANY shall not be required to reimburse the INSURED for salaries of employees of the INSURED.

In jurisdictions where the COMPANY may be prevented by law or otherwise from carrying out this agreement, the COMPANY shall pay any expense incurred with its written consent in accordance with this agreement.

B. When underlying Insurance, whether or not listed in Schedule A, does apply to an OCCURRENCE, the COMPANY shall have no duty to pay defense, investigations, settlement or legal expenses covered by such underlying insurance; however, the COMPANY shall have the right and opportunity to associate with the INSURED and any underlying insurer in the defense and control of any claim or suit reasonably likely to involve the COMPANY under this policy.

This contractual provision indicates that a duty to defend arises if an occurrence is not covered by underlying insurance collectible by the insured but is covered by the terms and conditions of the policy. Thus, to decide whether either GEICO or First State had a duty to defend, the Court must determine whether the OJF litigation was an occurrence covered by the terms and conditions of either policy.

■ The Court first determines whether First State had a duty to defend. For the reasons stated briefly below, the Court finds that First State did not have a duty to defend. The Court arrives at this conclusion because it is of the view that First State, by the terms of its policy of excess insurance, did not have a duty to defend unless and until its layer of coverage was reached. Since the parties have stipulated that in the absence of a finding of drop down liability First State's layer has not been reached, the Court finds that First State has no duty to defend. Stipulation No. 27, Docket No. 240.

The Court agrees that the Transit policy provisions regarding defense are read into the First State policy pursuant to the follow form endorsement. However, as was found above, First State's own limits of liability apply and the Court finds that these limits of liability establish the point at which First State must assume coverage and provide a defense if indeed the claims come within the terms of the First State policy. The Court finds persuasive in this regard the language in the Fifth Circuit case of *Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276 (5th Cir.1989), in which the Court states that:

[e]xcess liability insurers contract to provide inexpensive insurance with high policy limits by requiring the insured to contract for primary insurance with another carrier. The premium is also held down by the fact that the duty to defend rests primarily on the primary insurer, falling on the excess liability carrier only when the primary carrier is not required to defend because the loss is not covered by the primary policy. If excess liability carriers are required to defend in cases where the primary carrier would have defended except for insolvency, then the risk of the primary carrier's insolvency is placed on the excess carrier. Such 'a rule would require insurance companies to scrutinize one another's financial well-being before issuing secondary policies. The insurance world is complex enough; to impose this additional burden on com-

panies such as [the excess carrier] would only further our legal system's lamentable trend of complicating commercial relationships and transactions.'

*Id.* at 278–79 (citation omitted); *See also, Continental Marble & Granite v. Canal Ins. Co.*, 785 F.2d 1258, 1259 (5th Cir.1986) (court stating that to impose drop down liability under the facts of the case "would, in effect, transmogrify the policy into one guaranteeing the solvency of whatever primary insurer the insured might choose"); *Ware v. Carrom Health Care Products, Inc.*, 727 F.Supp. 300, 308–309 (N.D.Miss. 1989) (court stating that underlying insurance is not "exhausted" by a request in a complaint that is beyond the amount of the primary coverage and excess insurer therefore had no duty to defend unless and until primary insurance exhausted).

■ The Court finds as well that Transit's assumption of the defense of Revco up until the point of its insolvency did not bind First State to provide a defense for Revco. Transit certainly had the ability to provide a defense to Revco if it so chose and, if it did not in fact reserve its right to later contend that it was not responsible for providing the defense, then perhaps Transit was bound to pay the costs of defense. However, Transit's actions can in no way be said to bind First State to provide a defense, since, as the Court found above, Transit's and First State's responsibility for providing a defense were separate and distinct, First State's duty, if any, only arising under the terms of its policy when its layer of coverage was reached.[19]

■ The Court next turns to an examination of whether GEICO had a duty to defend. The Court notes first, that GEICO follows form to Transit's policy and that the Court's determination with respect to First State's duty to defend applies equally to GEICO's duty to defend. That is, the terms of GEICO's policy respecting the limits of liability mandate that GEICO has no duty to defend unless and until its layer of coverage is reached and then, GEICO is responsible for only forty per cent of the expenses, the other sixty per cent to be born by Midland. GEICO's layer of coverage was reached. Accordingly, the Court must next move on to address whether, under the terms of its policy, GEICO had a duty to defend Revco in the OJF litigation.[20]

The Court finds persuasive GEICO's argument that the claims asserted in the OJF litigation are not covered by either the terms of the GEICO or the terms of the Transit policy and that accordingly, GEICO had no duty to defend plaintiffs in the OJF litigation. As was indicated above in the Court's opinion, the GEICO policy follows form to the Transit policy as to terms, definitions, exclusions and conditions. The Transit policy provides that Transit will indemnify the insured:

for ULTIMATE NET LOSS, as defined hereinafter, in excess of RETAINED LIMIT, as herein stated, all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses, because of:

A. PERSONAL INJURY, as hereinafter defined;

B. PROPERTY DAMAGE, as hereinafter defined;

C. ADVERTISING INJURY OR DAMAGE, as hereinafter defined, to which the policy applies, caused by an OCCURRENCE, as hereinafter defined, happening anywhere in the world.

Motion for Summary Judgment of Defendant, Government Employees Insurance Company, Docket No. 251, at Exhibit C.

---

**19.** Plaintiffs also allege that First State's refusal to defend was made in bad faith. This claim has been rendered moot, however, by the Court's finding that First State had no duty to defend.

**20.** The Court notes that the parties have stipulated that while GEICO did not believe that it had any obligation to pay any sum either to or on behalf of Revco or Carter Glogau to settle the OJF case, GEICO nevertheless advanced on behalf of Revco the sum of One Million Dollars. The Court addresses the One Million Dollar payment and the issue of whether GEICO is entitled to recoup the One Million Dollars below.

The Transit policy defines Personal Injury as follows:

The term PERSONAL INJURY wherever used herein means:

(1) bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom, mental anguish and mental injury,

(2) false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution,

(3) Libel, slander, defamation of character, humiliation or invasion of the rights of privacy, unless arising out of advertising activities,

which occurs during the policy period.

*Id.*

The Transit Policy defines the term "occurrence" as "an accident or event including continuous repeated exposure to conditions, which results during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the stand-point of the INSURED."
*Id.*

Plaintiffs make the argument that the OJF litigation was the result of personal injury since OJF was sued because individuals sustained injury from being administered the E–Ferol solution which OJF distributed. However, the Court finds that such a characterization of the OJF litigation is inaccurate. Rather, the substance of the OJF litigation was OJF's allegation that Revco committed wrongful acts in connection with its issuance of the certificates of insurance. OJF and its insurers claimed to have been damaged because Revco did not have available insurance coverage which OJF was lead to believe was available to it. Granted, OJF itself was sued because of personal injury and then in turn

OJF sued Revco. However, the substance of OJF's suit was that OJF was harmed by Revco's failure to provide insurance coverage which OJF alleged Revco agreed to provide. OJF did not sustain personal injury or property damage as those terms are defined in the Transit policy. Accordingly, Revco did not, through the OJF litigation, sustain ultimate net loss because of personal injury or property damage and GEICO, therefore, had no duty to defend Revco in the OJF litigation.

█ Moreover, Transit's waiver, if any, did not operate as a waiver of GEICO's right to deny coverage. Plaintiffs have not provided authority in support of this contention. Plaintiffs have not provided evidence suggesting that Transit was acting as the agent of GEICO when it began providing a defense for plaintiffs in the OJF litigation. The follow form endorsement does not have the effect of rendering the waiver by one excess insurer binding on a second excess insurer that itself took no action which could be construed as the waiver of the right to deny coverage.

### F. GEICO'S CLAIM THAT IT IS ENTITLED TO RECOUP THE ONE MILLION DOLLARS IT ADVANCED REVCO TOWARD SETTLEMENT OF THE OJF LITIGATION.

GEICO contends that it is entitled to recoup the One Million Dollars it advanced to Revco toward the settlement of the OJF litigation since Revco and GEICO entered into an agreement whereby the parties agreed that in the event this Court determined that GEICO had no duty to indemnify and/or defend with respect to the OJF litigation, then this Court should enforce the terms of the agreement entered between the parties.[21] Resolution of this is-

---

**21.** The Court notes that on April 9, 1991, United States Bankruptcy Judge Harold White issued an Order Granting the Motion of GEICO for Relief From Stay in which Judge White ordered that "the automatic stay is modified solely to permit the pending action in the District Court for the Northern District of Ohio, Case No. 5:89CV0457, to proceed to final judgment, and GEICO and all other Defendants in said action are prohibited from commencing any action to collect from the property of the Debtors on any

liability resulting from said final judgment without further Order of this Bankruptcy Court."

In a Memorandum Opinion on the Motion for Relief from Stay, Judge White found that "[c]learly, the provisions of section 362(a) apply to the Recoupment Claim because it falls within the Bankruptcy Code definition of a claim and arose prior to the bankruptcy filing. Accordingly, GEICO must seek relief from the automatic stay to continue to assert the Recoupment Claim

sue requires the Court to determine whether GEICO has demonstrated, as a matter of law, that it has no duty to indemnify plaintiffs for the OJF litigation; that is, GEICO must demonstrate that it is entitled to judgment as a matter of law that the matters asserted in the OJF litigation did not fall within the coverage provided by GEICO's policy of excess insurance.

Revco makes two basic arguments supporting its position that GEICO is not entitled to summary judgment on this claim. First, plaintiffs argue that GEICO has submitted no summary judgment evidence in support of its claim for recoupment of the One Million Dollars. Second, plaintiffs argue that the determination of whether or not plaintiffs should reimburse GEICO involves questions of fact and thus cannot be resolved on motion for summary judgment. The Court finds neither of plaintiffs' arguments to have merit.

■ With respect to plaintiffs' first argument, the Court finds that GEICO has submitted sufficient evidence in support of its claim for recoupment. Plaintiffs state that submission by Revco of the agreement is not sufficient evidence. However, plaintiffs do not challenge the validity or authenticity of the agreement, nor do plaintiffs submit evidence to contradict the terms of the agreement. Likewise, the Court also has before it the comprehensive stipulations of the parties as well as the OJF petitions. The Court finds that it has sufficient evidence before it upon which to resolve the recoupment claim especially in light of the fact that plaintiffs have come forward with no factual evidence that contradicts GEICO's evidence.

The Court is not completely certain of the substance of plaintiffs' second argument. Apparently, plaintiffs argue that there are genuine issues of material fact with regard to the duty to indemnify that preclude summary judgment. Plaintiffs contend that the issue of a duty to defend and a duty to indemnify are different. Plaintiffs contend that a determination of whether a duty to indemnify exists requires consideration of the facts and thus cannot be resolved on motion for summary judgment. It seems that plaintiffs are suggesting that the facts involved in a particular case must be determined and examined before a court can make a determination that indemnity is or is not due. Plaintiffs may be correct in some cases. However, the OJF litigation was settled and did not and will not go to trial. Plaintiffs have not come forward with contradictory facts to those before the Court. Thus, the Court concludes that it can resolve the issue of whether GEICO had a duty to indemnify by examining the stipulations before it. If the Court determines that GEICO does not have a duty to indemnify, then it must proceed to enforce the terms of the agreement between plaintiffs and GEICO by which plaintiffs agreed to reimburse the One Million Dollars upon a finding of lack of coverage.

The Court finds that GEICO does not have a duty to indemnify plaintiffs for the amount spent in settlement of the OJF litigation since, as the Court determined above in its Opinion, the OJF litigation was not an occurrence resulting because of personal injury or property damage. The Court has examined the petitions filed in the OJF litigation and finds that the essence of the OJF litigation was a claim by OJF and its insurers against plaintiffs for failure to provide insurance coverage as allegedly promised by the certificates of insurance. Granted, OJF would not have been sued absent personal injury to recipients of E–Ferol. However, the personal

---

in District Court." Judge White then went on to find that GEICO had demonstrated cause for limited relief from the automatic stay. Judge White noted that "[m]odification of the stay to permit resolution of all claims in one forum will promote judicial economy and prevent any prejudice to GEICO which would result if it had to litigate the Recoupment Claim separately."

Judge White ordered that a limited relief from stay be granted whereby GEICO can pursue its recoupment claim before this Court but cannot execute on any judgment absent express order of the Bankruptcy Court.

The Bankruptcy Court having granted GEICO a limited relief from stay, this Court can proceed to determine whether in fact GEICO is entitled to summary judgment in its favor on the claim for recoupment of the One Million Dollars it advanced plaintiffs toward the OJF settlement.

injuries are once removed from the OJF litigation. OJF was injured by an alleged breach of contract on the part of plaintiffs and other wrongdoing.[22]

The Court having determined that GEICO has no duty to indemnify, next turns to an examination of the agreement between plaintiffs and GEICO. The Agreement provides, in pertinent part:

> If it is finally determined in cause No. 87CI–22568 that GEICO was not obligated to provide coverage to Revco and Carter Glogau in connection with the allegations for which settlement was made in cause No. 85CI–14733, Revco and Carter–Glogau will refund and repay to GEICO One Million Dollars ($1,000,000.00) contributed to the settlement of cause No. 85CI–14733 by GEICO, such refund and payment having the effect of reinstating limits of coverage provided by GEICO in a pro tanto amount. Additionally, such refund and repayment will not be subject to interest charges.

GEICO's Motion for Summary Judgment, Docket No. 251 at Exhibit H. This Court has "finally" determined that GEICO was not obligated to provide coverage to plaintiffs in the OJF litigation. Accordingly, the Court finds in favor of GEICO on its claim for recoupment of its One Million Dollars. The Court notes that, pursuant to the terms of the agreement, the repayment shall not be subject to interest charges.

## G. RULE 54(b) CERTIFICATION.

■ The Court is of the view, for the reasons articulated in this section of the Court's Opinion, that there is no just reason for delay of the entrance of a final judgment in favor of defendants GEICO and First State. Accordingly, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court orders that a final judgment be entered in favor of defendants GEICO and First State.

Rule 54(b) of the Federal Rules of Civil Procedure provides that:

**(b) Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed.R.Civ.P. 54(b).

Rule 54(b) was enacted as "a response to the need created by the liberal joinder provisions of the Federal Rules of Civil Procedure to revise 'what should be treated as a judicial unit for purposes of appellate jurisdiction.'" *Corrosioneering v. Thyssen Environmental Systems*, 807 F.2d 1279, 1282 (6th Cir.1986) (citation omitted). The Rule "'attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties.'" *Id.* (citations omitted). The determination of whether to allow for an appeal pursuant to Rule 54(b) is a matter left to the discretion of the district court. *Id.*

The Rule itself states that the district court must find that there is no just reason for delay of the appeal. Fed.R.Civ.P. 54(b). However, the Sixth Circuit has indicated that in order to avoid a finding of abuse of discretion in the certification of an appeal pursuant to Rule 54(b), the "district court

---

**22.** Since the Court has found that the OJF litigation did not constitute an occurrence because of personal injury or property damage and consequently GEICO has no duty to indemnify, the Court need not address GEICO's other arguments it asserted in support of its lack of a duty to indemnify.

should do more than just recite the Rule 54(b) formula of 'no just reason for delay.' " *Id.; Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 61 (6th Cir.1986). As the Supreme Court explained in *Protective Committee v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968):

It is essential, however, that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law.

*Id.* at 434, 88 S.Ct. at 1172.

The Sixth Circuit set forth a "nonexhaustive list" of factors to consider in *Corrosioneering, supra,* as follows:

(1) the relationship between the adjudicated and the unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense and the like. Depending upon the factors of the particular case, all or some of the above factors may bear upon the propriety of the trial court's discretion in certifying a judgment as final under Rule 54(b).

*Corrosioneering,* 807 F.2d at 1283 (quoting *Allis–Chambers Corp. v. Philadelphia Electric Co.,* 521 F.2d 360 (3d Cir.1975)). The Court now proceeds to highlight the factors relevant to its determination to certify a final judgment in favor of defendants GEICO and First State pursuant to Rule 54(b).

The Court finds the first relevant factor to be that there is little relationship between the claims that plaintiffs assert against defendants GEICO and First State and the claims plaintiffs assert against defendant New England. Indeed, the Court made this determination when it initially decided to separate the motions for summary judgment on the claims between plaintiffs, GEICO and First State, and the claims of plaintiffs against defendant New England. As was outlined above in the Court's Opinion, plaintiffs' claims against defendants GEICO and First State essentially involve a dispute over insurance coverage. In contrast, plaintiffs assert claims of bad faith, negligence and/or gross negligence against defendant New England. Plaintiffs allege that Revco is an insured under a policy issued by New England, and New England brought suit against Revco claiming subrogation to the rights of OJF under the policy. Plaintiffs allege that the following actions constituted bad faith, negligence and/or gross negligence on the part of New England: 1.) pursuing a subrogation action against its own insured; 2.) financing E–Ferol claims in whole or part against Revco, its own insured; 3.) seeking to obtain coverage under the insurance certificates when New England knew no such coverage was available; 4.) obtaining Mary Carter agreements from E–Ferol claimants and using the agreements to its benefit and against its own insured; 5.) pursuing an action under the Texas Insurance Code against its own insured which was groundless; 6.) conspiring with First State against the interests of plaintiffs; 7.) failing to protect the confidences of its insured, and 8.) conspiring with First State and inducing First State not to drop down and assume insurance coverage in order to put financial pressure upon plaintiffs so plaintiffs would pay claims.

Clearly, the claims asserted against defendant New England have little if no relationship to the claims asserted against defendants GEICO and First State other than the fact that the claims are all related, in a sense, to the E–Ferol controversy. The resolution of the claims against defendants GEICO and First State required that the Court construe and interpret the language of the subject insurance agreements and determine whether the defendants had a duty to provide insurance coverage and

whether the defendants had a duty to defend plaintiffs in the OJF litigation. The allegations against defendant New England are wholly separate and distinct from the claims against GEICO and First State.

As to the second factor listed above, the Court finds that there is no chance that the need for review would be mooted by a resolution of plaintiffs' claims against defendant New England. As was stressed above, the claims against GEICO and First State involve completely different issues than the claims against New England. A subsequent determination that New England did or did not act in bad faith with respect to plaintiffs will have no bearing on this Court's determination that neither GEICO nor First State had a duty to drop down and assume insurance coverage at the point of Transit's insolvency. Likewise, there is no chance that the reviewing Court will have to consider an issue twice since the claims against New England do not involve the same issues as the claims against GEICO and First State.

The Court notes that a particularly important consideration in the present case is that of delay. In light of the fact that the claims against New England are different than those against GEICO and First State, it seems unfair for the Court to require that plaintiffs await the resolution of their claims against New England before they can pursue an appeal if they so desire. A significant amount of money is at stake in this case. The sooner the matter of insurance coverage can be finally resolved the better.

For the reasons stated above, the Court finds that there is no just reason for delay in entering a final judgment in favor of defendants GEICO and First State on all of plaintiffs' claims against them and in favor of defendant GEICO on its claim for recoupment of the One Million Dollars it advanced to plaintiffs toward settlement of the OJF litigation. Accordingly, pursuant to Rule 54(b), the Court directs that a final judgment be entered in favor of defendants GEICO and First State on all of plaintiffs' claims against them and in favor of defendant GEICO on its claim that it is entitled to recoup the One Million Dollars it advanced to plaintiffs toward settlement of the OJF litigation.

## CONCLUSION

In sum, for the reasons set forth above, the Court finds that defendants GEICO and First State are entitled to summary judgment in their favor on plaintiffs' claim for drop down insurance coverage. Likewise, the Court finds that defendant GEICO is entitled to summary judgment in its favor on plaintiffs' claim that GEICO must pay one-hundred per cent of the covered claims in its layer of excess insurance coverage as opposed to the forty per cent it has been paying.

Additionally, the Court finds that neither defendant First State nor defendant GEICO had a duty to defend plaintiffs in the OJF litigation and accordingly the Court grants defendants GEICO and First State summary judgment on plaintiffs' claims relating to a duty to defend.

Finally, the Court finds, as a matter of law, that defendant GEICO is entitled to repayment by plaintiffs of the One Million Dollars it advanced toward the OJF settlement and accordingly the Court grants summary judgment to defendant GEICO on this claim.

The Court also finds that entry of a final judgment in favor of defendants GEICO and First State pursuant to Rule 54(b) of the Federal Rules of Civil Procedure is warranted. The Court directs that a final judgment in favor of defendants GEICO and First State on all of plaintiffs' claims against them and in favor of GEICO on its claim for recoupment of the One Million Dollars it advanced to plaintiffs be entered.

In its Order of August 13, 1990, the Court deferred scheduling summary judgment practice with respect to plaintiffs' claims against defendant New England pending resolution of the summary judgment motions of Revco, GEICO and First State. These motions having been resolved, the Court will by separate order schedule a status conference to discuss

plaintiffs' claims against defendant New England.

IT IS SO ORDERED.